## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**JOHNNY ARGUELLO,**

      **Plaintiff,**                           **Case No. 12 CV 432 JAP/LAM**

**vs.**

**DAYNA ARGUELLO,**
**STATE OF NEW MEXICO, and**
**KERI PATTISON,**
**individually and in her official capacity,**
**JOHN AND JANE DOES I-V,**
**ABC CORPORATIONS I-V, and**
**XYZ PARTNERSHIPS I-V,**

      **Defendants.**

### MEMORANDUM OPINION AND ORDER

Defendant Keri Pattison (Pattison), an employee of the New Mexico Children, Youth and Families Department (CYFD), asks the Court to grant summary judgment on the basis of qualified immunity on all federal law claims brought by Plaintiff Johnny Arguello (Plaintiff) under 42 U.S.C. § 1983.  *See* MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY OF DEFENDANT PATTISON (Doc. No. 36) (Motion).[1]  The Court will grant the Motion because Pattison is entitled to qualified immunity from those claims.  Since only the state law tort claims will remain pending against Defendant Pattison and Defendant Dayna Arguello, the Court will decline to exercise supplemental jurisdiction and will remand this case

---

[1] In ruling on the Motion, the Court has also considered the MEMORANDUM IN SUPPORT OF DEFENDANT PATTISON'S MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY (Doc. No. 37); RESPONSE IN OPPOSITION TO "MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY OF DEFENDANT PATTISON" (Doc. No. 44); and DEFENDANT PATTISON'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY (Doc. No. 49).

to the Ninth Judicial District Court, Curry County, New Mexico. 28 U.S.C. § 1367 (c).

    I.  Standard of Review

    Under Fed. R. Civ. P. 56, summary judgment is appropriate if there is no genuine issue as

to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a).  The defense of qualified immunity protects government officials, like Pattison, from

individual liability under 42 U.S.C. § 1983 for actions taken while performing discretionary

functions, unless their conduct violates "clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"When a defendant pleads qualified immunity, the plaintiff has the heavy burden of establishing:

(1) that the defendant's actions violated a federal constitutional or statutory right; and (2) that the

right violated was clearly established at the time of the defendant's actions." *Greene v. Barrett*,

174 F.3d 1136, 1142 (10th Cir. 1999).  Given the purposes underlying qualified immunity, a

plaintiff's burden is "heavy" in opposing summary judgment notwithstanding the court's

obligation to view the evidence in the light most favorable to the plaintiff. *Arredondo v.

Locklear*, 371 F. Supp. 2d 1281, 1295 (D. N.M. 2005) (citing *Gross v. Pirtle*, 245 F.3d 1151,

1155 (10th Cir. 2001)).

    In the qualified immunity context, courts usually "accept the facts as the plaintiff alleges

them." *Riggins v. Goodman*, 572, F.3d 1101, 1107 (10th Cir. 2009).  However, at the summary

judgment stage, the plaintiff's version of the facts must be supported by admissible evidence in

the record.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Thus, the Court must determine whether

Plaintiff's allegations are "sufficiently grounded in the record[,]" and then the Court must

determine whether those facts establish a violation of Plaintiff's constitutional rights.  In this

case, Plaintiff has failed to establish that Pattison violated Plaintiff's clearly established

constitutional rights. Thus, the Court need not consider the next step in the process, i.e. whether

Pattison has proven that there are no genuine issues of material fact and that Pattison is entitled

to judgment as a matter of law. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

II.  Background [2]

In early 2010, Plaintiff and Defendant Dayna Arguello (Defendant Arguello) were

involved in a contentious divorce and child custody proceeding. (Mot. Ex. 1, Pattison Aff. ¶ 5;

Resp. Ex. A, J. Arguello Aff. ¶ 7.)  Plaintiff was granted temporary custody of the couple's

child, L.A, and Defendant Arguello was granted supervised visitation rights. (Pattison Aff. ¶ 7.)

Pattison was appointed by the domestic relations court to supervise Defendant Arguello's  visits

with L.A.  Pattison is a licensed Master Social Worker and has been employed by the CYFD

since 1998. (Pattison Aff. 1 ¶¶ 2-3,7; J. Arguello Aff. ¶ 8.)  Pattison is also Defendant Arguello's

mother and L.A.'s grandmother.  *Id. See also Arguello v. Arguello*, Case No. D-0905-DM-

0200800594, ORDER ON PETITIONER'S MOTION AND ORDER TO SHOW CAUSE (Ex. A

to Pattison Aff.) (Supervision Order).

On January 22, 2010, in accordance with the Supervision Order, Pattison picked up L.A.

from Plaintiff's residence for a 24-hour period of supervised visitation with Defendant Arguello.

(Pattison Aff. ¶ 8.)  L.A., who was six years old at the time, was uncooperative and difficult to

control.  Pattison had to carry L.A. to her car.  (*Id.* ¶ 9.)  Plaintiff testified that L.A. "did not want

to go with Defendant Pattison and began to scream and struggle.  Plaintiff picked up the minor

child and handed the child to Defendant Pattison.  As the minor child kicked and screamed,

---

[2] The background facts come from the undisputed facts in the Motion and the allegations
in the Complaint that are supported by admissible evidence.  The Court has not included facts
that have been disputed by admissible summary judgment evidence.

Defendant Pattison struggled to hold the minor child, stumbling and almost falling on two (2) occasions, and each time pulling the child closer and holding LA tighter." (Response Ex. A, Affidavit of Johnny Arguello ¶¶ 10-11.)

Pattison took L.A. to the mall where L.A. continued to act out. (*Id.*)  Pattison then took L.A. to Defendant Arguello's apartment and put L.A. to bed at about 8:30 pm. (*Id.* ¶¶ 10-11.) [3] When Defendant Arguello returned to her apartment later that evening, Defendant Arguello checked on L.A. and noticed a bruise in the shape of a hand on L.A.'s left thigh. (*Id.* ¶ 13.) Pattison also looked at L.A.'s leg and saw the bruise. (*Id.*)  Pattison and Defendant Arguello took a photograph of the bruise. (*Id.*)  Pattison called the Clovis Police Department and reported what she had seen. (*Id.* ¶ 15.)  Pattison also explained the custody arrangement and described the behavior that L.A. exhibited earlier in the day.  (*Id.*)

At approximately 11:25 pm, Clovis Police Officer Cameron Reeves (Officer Reeves) arrived at Defendant Arguello's apartment in response to the report.  (*Id.* ¶ 16.)  According to Officer Reeves' report, Officer Reeves was advised by Defendant Arguello that L.A. "had a handprint on his left thigh." (Ex. 4, Ex. A State of New Mexico Uniform Incident Report.) Officer Reeves looked at L.A., while L.A. was sleeping, and Officer Reeves reported that he "did indeed observe four finger marks on [L.A.'s] left thigh." (*Id.*)  Officer Reeves took pictures of L.A.'s leg. (*Id.*)  In his report, Officer Reeves stated that he was unable to interview Plaintiff

---

[3] Plaintiff disputes Pattison's account of the trip to the mall because "he has no knowledge of the whereabouts of Defendant Pattison and the minor child upon leaving his house."  (Resp. 2.)  However, this assertion is not admissible as evidence.  Pattison's account is supported by a properly executed affidavit based on personal knowledge, which can only be disputed by countervailing evidence that is admissible on summary judgment. Plaintiff's assertion that a fact is disputed based on lack of Plaintiff's personal knowledge is insufficient to create a disputed fact. Fed. R. Civ. P. 56(e) (stating that a party asserting that a fact is disputed must support the assertion by citing to the record consisting of admissible evidence).

at that time and that "[i]t is unknown . . . if John Arguello caused the handprint on [L.A.'s] thigh." (*Id.*)  Officer Reeves contacted "SCI to make a referral about this incident."  (*Id.*) [4]

At 12:08 am on January 23, 2010, Pattison also called Statewide Central Intake for CYFD to report suspected child abuse and neglect. (Pattison Aff. ¶ 18.)  The CYFD classified the report from Pattison as a Priority 1 report. (Reply Ex. 7, CYFD Intake Report.)[5]

On January 23, 2010, Carol Gonzales, a CYFD Investigations Supervisor in the Clovis office, directed CYFD Investigator Donald Graves (Graves) to conduct a welfare check at Defendant Arguello's house in response to Pattison's report.  (Pattison Aff. ¶ 20; Mot. Ex. 2, Graves Aff. ¶ 3.)  Pattison is not Graves' supervisor. (Pattison Aff. ¶ 20; Graves Aff. ¶ 4.) Within 24 hours of a report of possible child abuse that is classified "Priority 1," CYFD policy requires that a CYFD employee conduct a welfare check.  (Graves Aff. ¶ 5.)  A welfare check is a visit to the child's residence to ensure that the child is "in a safe home environment and to determine if the child is in danger of serious harm." (*Id.*)  During a welfare check, Graves usually talks to caregivers and witnesses if they are available. (*Id.*)  Prior to the welfare check, Graves was told that L.A. was the grandchild of his co-worker, Pattison, and that Pattison was supervising L.A.'s visitation with Defendant Arguello at Defendant Arguello's apartment. (*Id.* ¶

---

[4] SCI stands for Statewide Central Intake, which receives reports of possible child abuse or neglect in New Mexico. (Garcia Aff. ¶ 5.)  Each report is screened for appropriate allegations of child abuse or neglect and given a priority based on the seriousness of the allegations. (*Id.*)  SCI then forwards reports of alleged child abuse or neglect to the local CYFD offices via the CYFD computer system where the report is assigned for investigation. (*Id.*)

[5] The APS/CPS Intake Report generated by the CYFD states that Pattison, who is referred to as "Source," was "not sure where the marks came from."  CONFIDENTIAL EXHIBIT filed under Seal as Exhibit 7 to DEFENDANT PATTISON'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY (DOC. NO. 49) FILED AUGUST 27, 2012 (Doc. No. 58).

7.)

On January 23, 2010, Graves, along with Officer Trevor Thron of the Clovis Police Department, first visited Defendant Arguello's apartment because CYFD policy requires an investigator to begin at the location from which a report originates. (*Id.* ¶ 9.)  Pattison stepped out of the room while Graves interviewed Defendant Arguello, and Graves heard Defendant Arguello's account of the events which prompted the report. (*Id.*)  Graves also interviewed Pattison, and listened to Pattison's account of the events that occurred the previous evening. (*Id.* ¶ 11.)  Graves and Officer Thron spoke to L.A., who stated that he had not been spanked. (*Id.* ¶ 12.)  Graves testified that neither Defendant Arguello nor Pattison "named L.A.'s father, Johnny Arguello, as the suspected perpetrator." (*Id.* ¶ 13.)  Graves determined that Defendant Arguello's apartment was in appropriate condition, and Graves did not have concerns for L.A.'s safety at that point. (*Id.* ¶ 14.)

Next, Graves and Officer Thron went to Plaintiff's residence. (*Id.* ¶ 15.)  At first, Plaintiff refused to let Graves and  Officer Thron enter his residence. (*Id.*)  However, a short time later, Plaintiff invited Graves and Officer Thron into his residence. (*Id.*)  Plaintiff testified, "[w]hen the armed officer arrived, I felt that I did not have any choice but to let them into my home.  They wanted to look around, and I felt that I had no choice but to let them." (J. Arguello Aff. ¶ 33.)  Plaintiff further testified, "Donald Graves, and an armed, uniformed Clovis Police officer, . . . showed up at my residence and interrogated me for a lengthy period of time." (*Id.* ¶ 12.)  According to Plaintiff, "[i]t was not a brief welfare check. The interrogation was over half an hour long."  (*Id.* ¶ 13.)

Graves found the condition of Plaintiff's residence to be appropriate. (Graves Aff. ¶ 17.)  After the  welfare checks, Graves had no more involvement in the investigation, and Graves did

not discuss the case with Pattison. (*Id.* ¶¶ 19- 21.)

When a CYFD employee has a close relationship with a minor victim or is a relative of a minor victim, CYFD usually transfers the investigation to another CYFD Office. (Mot. Ex. 3, Robin Garcia Aff. ¶ 7.)  On January 24, 2010, Cory McCarrell, an Investigations Supervisor with the CYFD office in Hobbs, New Mexico, requested that Robin Garcia (Garcia), Investigations Supervisor of the Clovis CYFD Office, transfer the investigation to the Hobbs CYFD office. (Pattison Aff. ¶ 21; Robin Garcia Aff. ¶ 6.)  Garcia  assigned the investigation to Rosa Alvarez (Alvarez) because Garcia knew that Alvarez did not know Pattison. (Garcia Aff. ¶ 9.)  Garcia supervised Alvarez in the investigation. (*Id.* ¶¶ 10-12.)

Garcia instructed Alvarez to interview L.A., Defendant Arguello, Pattison, Plaintiff, and L.A.'s paternal grandparents, Gloria and Tommy Arguello, "because all of these persons were involved with the minor child and the report of suspected child abuse." (*Id.* ¶ 11.)  Garcia later learned that there was no disclosure of abuse by L.A. at an Oasis Safe House Interview (Oasis Interview) held on February 19, 2010. (*Id.* ¶ 13.)  On April 28, 2010, "the CYFD Hobbs office concluded that the report of suspected child abuse was unsubstantiated." (*Id.* ¶ 14.)

Pattison testified that, other than her initial telephone report and her interviews with Officer Reeves, Graves, and Alvarez, she had no involvement with the CYFD's investigation. (*Id.* ¶ 24.)  Pattison testified that she was not involved with any decisions made by either the Clovis or Hobbs offices of the CYFD regarding the manner in which the investigation was conducted. (*Id.* ¶ 25.)  Pattison testified that she was not aware that during the investigation, the Clovis Police Department and the Clovis District Attorney had planned to seek an order from the domestic relations court requiring an Oasis Interview of L.A. (*Id.* ¶ 27.)  Pattison had no involvement in the Oasis Interview. (*Id.* ¶ 28.)

Clovis Police Detective Rick Smith was assigned to investigate the child abuse report on January 25, 2010. (Mot. Ex. 4, Smith Aff. ¶ 2. )  The police report is attached to Smith's affidavit as Exhibit A.  Detective Smith testified, "[i]t is the Clovis Police Department's practice to request an Oasis [I]nterview during child abuse investigations, if appropriate." (Smith Aff. ¶ 4.)  An Oasis Interview is an interview by investigators out of the presence of the child's parents. (*Id.*)  On February 2, 2010, Detective Smith telephoned Plaintiff about the report. (*Id.*)  Later that day, Detective Smith received a telephone call from Plaintiff's attorney, Daniel Lindsey. (*Id.* ¶ 5.)  Detective Smith explained the investigation to Mr. Lindsey and asked Mr. Lindsey to ask Plaintiff to consent to an Oasis Interview of L.A. (*Id.*)

On February 10, 2010, Detective Smith became aware that Plaintiff had filed an "Ex Parte Motion to Suspend Contact, Issuance of a Protective/Restraining Order, and Termination of Insurance" (Ex Parte Motion) in the domestic relations proceeding. (*Id.* ¶ 9.)  In the Ex Parte Motion, Plaintiff requested an order to "cease and desist" all allegations of child abuse against Plaintiff. (*Id.*)  Detective Smith was concerned that the investigation would be affected if the court granted the Ex Parte Motion. (*Id.*)

On February 12, 2010, Detective Smith asked Assistant District Attorney Brian Stover for help to obtain an Oasis Interview with L.A. and to challenge the Ex Parte Motion. (*Id.* ¶ 10.) The state district court presiding over the domestic relations case held a hearing on Plaintiff's Ex Parte Motion on February 15, 2010. (*Id.* ¶ 11.)

At the February 15, 2010 hearing, Assistant District Attorney Hollie Barnett (Barnett) entered an appearance on behalf of the State of New Mexico. (Mot. Ex. 5, Barnett Aff. ¶ 5.) Barnett made an oral motion asking the judge to deny the portion of the Ex Parte Motion that asked for an order to cease and desist all allegations of abuse against Plaintiff.  (*Id.* ¶ 6.)  At the

8

hearing, Barnett asserted that it appeared Plaintiff was asking the court to prohibit the ongoing

investigation of child abuse. (*Id.*)  Plaintiff "attended the hearing and opposed the Oasis

interview." (*Id.* ¶ 7.)  The judge denied the portion of Plaintiff's Ex Parte Motion that sought to

have the investigation cancelled. (*Id.* ¶ 8.)  However, the court also ordered an Oasis Interview

of L.A. (*Id.*)  Barnett "did not represent the New Mexico Children, Youth and Families

Department ("CYFD"), or any of its employees, at the hearing on February 15, 2010." (*Id.* ¶ 9.)

In addition, Barnett "never spoke to anyone at CYFD regarding obtaining an Oasis [I]nterview

of the minor child." (*Id.* ¶ 10.)

Plaintiff notes that several employees of CYFD were present at the February 15, 2010

hearing, including CYFD Area Supervisor Don Holden, CYFD attorney Patricia Schroeder,

Pattison, and Alvarez. (J. Arguello Aff. ¶ 62.)  Plaintiff contends that he felt the CYFD

employees and their representatives attended the hearing to influence the judge to order an Oasis

Interview. (*Id.* ¶ 63.)  Patricia Schroeder, an attorney for the CYFD, addressed the court and

requested an Oasis Interview of L.A. as part of the CYFD's investigation. (*Id.* ¶ 64; Resp. Ex. C

(partial transcript).)

Plaintiff maintains that L.A.'s counselor, Cheryl Cash, MA, LPCC, CCDVC,

recommended against the Oasis Interview, and Plaintiff opposed the interview based in part on

Ms. Cash's opinion. (*Id.* ¶¶ 41, 61.) [6]  Plaintiff contends that during the investigation, each time

that Plaintiff and Defendant Arguello exchanged L.A. for visitation, Graves and Officer Thron

were present "causing disruption for L.A. and heightened fear for [Plaintiff]." (*Id.* ¶ 60.)

Plaintiff asserts that during the investigation he "suffered extreme emotional distress . . .

including many sleepless nights, wondering– . . . if I was going to lose my son." (*Id.* ¶ 45.)

Detective Smith testified that an Oasis Interview was arranged for February 19, 2010.

(Smith Aff. ¶ 12.)  Detective Smith attended the interview, which lasted about fifty minutes. (*Id.*

¶ 13.)  Detective Smith stated that during the interview, L.A. did not state that any inappropriate

contact had occurred, and L.A. ". . . stated he was not afraid of anyone in his family, including

Ms. Arguello and Mr. Arguello." (*Id.* ¶ 14.)[7]  Based on the information obtained from the

investigation and the Oasis Interview, Detective Smith found no child abuse or neglect. (*Id.* ¶

---

[6] Plaintiff attached to his Response two letters written by Ms. Cash; however, the letters
are hearsay and will not be considered as evidence for purposes of ruling on the Motion. (*See*
Resp. Ex. D.)  Pattison asks the Court to disregard the letters as inadmissible hearsay and as
unauthenticated documents. *See* MOTION TO STRIKE EXHIBITS ATTACHED TO
PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Doc. No. 55).  Under Fed. R. Evid. 901, the Court concludes that the letters have distinctive
characteristics supporting authenticity.  *Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK)*,
805 F. Supp. 2d 1145, 1153-54 (noting that the Tenth Circuit does not require an affidavit to
authenticate every document submitted for consideration at summary judgment and noting that a
letter written on NMDOT letterhead had other signs of authenticity such as alignment of
recipient's name and address with the subject line).  Although the letters are hearsay, even if the
Court considered the information in the letters to show Plaintiff's reason for refusing to consent
to the Oasis Interview, the counselor's recommendation against the Oasis Interview is not
material to the Court's decision to grant summary judgment in this case.  Pattison's qualified
immunity does not depend on whether it was proper for the court to order the Oasis Interview.

[7] Although this testimony contains hearsay, the Court has not considered it for the truth
of the matter asserted but has considered it as evidence of the reason that the investigation was
closed and no action taken against either Plaintiff or Defendant Arguello. *United States v.
Ledford*, 443 F.3d 702, 707 (10th Cir. 2005) (stating that a statement offered to prove something
other than the truth of the matter asserted "is not hearsay.").

15.)  The custody arrangement remained in place, and the investigation was closed in March

2010 without any action taken against Plaintiff or Defendant Arguello. (*Id.*)

III. Plaintiff's § 1983 Claims

In the First Claim For Relief, Plaintiff alleges that Pattison made a false report of

suspected child abuse, which violated his federal substantive due process right to familial

integrity. (Compl. ¶¶ 15, 22-31; J. Arguello Aff. ¶ 17.)  Also in the First Claim For Relief,

Plaintiff alleges that Pattison violated his Fourth Amendment right "not to have [his] liberty

placed in issue by the state without probable cause." (Compl. ¶ 26.)  Plaintiff asserts that the

State[8] failed to properly train, supervise, and screen its employee, Pattison, in violation of 42

U.S.C. § 1983.  Under state law, Plaintiff asserts claims of defamation and *prima facie* tort

against Defendants Arguello and Pattison.

In a MEMORANDUM OPINION AND ORDER (Doc. No. 39) (Order), the Court

granted DEFENDANTS' MOTION TO DISMISS COUNTS I, II, III AND IV (Doc. No. 29) and

ruled that Pattison, as a state official in her official capacity, is not considered to be a "person"

within the meaning of § 1983 against whom a claims for damages could be asserted.  Hence, the

Court dismissed all § 1983 claims for damages against Pattison in her official capacity.  *Hull v.*

*State of New Mexico Taxation & Revenue Dept.*, 179 Fed. App'x 445, 446 (10th Cir. 2006)

(unreported decision).  *See also Howlett v. Rose*, 496 U.S. 356, 365 (1990); and *Will v. Mich.*

*Dep't of State Police*, 491 U.S. 58, 71 (1989)).  The Court also dismissed Plaintiff's claim under

42 U.S.C. § 1983 against the CYFD for lack of subject matter jurisdiction under the Eleventh

---

[8] Plaintiff did not specifically name CYFD as a defendant in this action but has only named the State of New Mexico in the Complaint. However, throughout the Complaint Plaintiff refers to the CYFD as the governmental authority about which he complains.  The Court will refer to the CYFD as the state entity against which the claims are brought.

Amendment of the United States Constitution. [9]  The Court dismissed Plaintiff's state law claim for defamation against Pattison in her official capacity.  As a state employee, Pattison is immune from defamation suits for damages, because sovereign immunity has not been waived under the New Mexico Tort Claims Act (NMTCA).  Similarly, the Court dismissed Plaintiff's claim against Pattison for *prima facie* tort because immunity has not been waived for that tort claim under the NMTCA.  The only remaining federal claims against Pattison are Plaintiff's § 1983 claims against Pattison in her individual capacity for the violations of Plaintiff's Fourteenth Amendment right to familial integrity and for violations of Plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures.

IV.  Discussion

A.  The Fourteenth Amendment Right to Familial Integrity

Plaintiff contends that Pattison made a false report of child abuse to CYFD that led to an investigation in which Plaintiff "was forced to subject himself, and his minor son, to the rigorous investigatory process, including being forced to deliver his minor son to the police for an interview out of his presence on February 19, 2010 . . ." (Compl. ¶¶ 15-18.)  Plaintiff alleges that by reporting suspected child abuse, Pattison "maliciously, willfully, recklessly, wantonly, fraudulently or in bad faith," set in motion a destructive chain of events that violated his Fourteenth Amendment right to familial integrity.  (*Id.* ¶ 20.)

Courts have long recognized that the Fourteenth Amendment's Due Process Clause, like its Fifth Amendment counterpart, "guarantees more than fair process." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting, *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997)). The Due

---

[9]  Alternatively, the Court dismissed Plaintiff's § 1983 claims against the State because the State is not considered a "person" subject to suit under § 1983.

Process Clause includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* (quoting *Glucksberg*, 521 U.S. at 720 and citing, *Reno v. Flores*, 507 U.S. 292, 301–302 (1993)).  The Fourteenth Amendment protects a parent's right to "familial integrity," which includes the right to make decisions concerning the care, custody, and control of his or her children. *Troxel v. Granville*, 530 U.S. 57, 66-67 (2000) (citations omitted) (holding that Washington state law broadly allowing any person to seek child visitation rights violated the Fourteenth Amendment).

However, courts also recognize that a parent's right to custody of his or her minor child is balanced against the countervailing state interest in protecting the child from abuse.  *See Stanley v. Illinois*, 405 U.S. 645, 649 (1972) (stating that the State has a "right—indeed, duty—to protect minor children through a judicial determination of their interests in a neglect proceeding").  According to the United States Supreme Court, the right to familial integrity "is limited by an equally compelling governmental interest in the protection of children" from abuse.  *Maryland v. Craig*, 497 U.S. 836, 855 (1990) (stating that governmental agencies have a "traditional and transcendent interest" in protecting children within their jurisdiction from abuse).  Importantly, parents do not have a constitutional right "to be free from child abuse investigations."  *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir. 1988).

Government officials who knowingly make false reports child abuse or who knowingly pursue false reports of abuse can be liable for violation of the substantive due process right to familial integrity.  For example, in *Malik v. Arapahoe County Soc. Serv's*, 191 F.3d 1306 (10th Cir. 1999), the Tenth Circuit Court of Appeals affirmed a holding that officials in Arapahoe County, Colorado violated a mother's right to familial integrity by seeking a court order to remove her child based on misrepresentations and omissions of vital facts to the court.  The

investigation in *Malik* began when a Denver postal inspector discovered nude photographs of a child, and that the film had been mailed for processing by the plaintiff Malik.  The postal inspector and an Aurora police officer began an investigation of possible violations of child pornography laws. *Id.* at 1309.  The police officer learned that Malik's brother had taken the photographs four months earlier during a visit to Denver. *Id.*  Malik informed the officer that her brother lived in New York and took the photos for artistic reasons. *Id.*  Malik later agreed to allow the officer to interview the child, but only if the interview was videotaped, a condition requested by Malik's attorney. *Id.*  A few days after receiving the request for a videotaped interview from Malik's attorney, the police officer and a social worker with the Arapahoe County Department of Social Services (ACDSS) decided to seek a court order requiring Malik to submit to an untaped interview of her child. *Id.* at 1311.  To obtain an ex parte court order from a magistrate judge, the social worker omitted several important facts: 1) that the photos were taken five months prior by a person who did not live in the child's home; 2) that the authorities did not consider the child to be in imminent danger; and 3) that the mother had consented to an interview if it was videotaped, which was allowed and even encouraged under the Colorado statutes. *Id.* at 1312.  The magistrate judge entered an order placing custody of the child in the ACDSS and directed the social worker to pick up the child. *Id.*  The child was removed from Malik's house and taken to a family crisis safehouse overnight. *Id.*  At a hearing the next day, the ACDSS and Malik agreed that Malik would retain custody of the child and that a videotaped interview would take place that day.  The interview revealed no evidence of abuse, the child returned home with her mother, and no charges were filed.  *Id.* at 1313.  Malik brought § 1983 claims against ADCSS, the social worker, and the police officer alleging violations of her Fourteenth Amendment right to familial integrity and violations of her Fourth Amendment right

14

to be free from unreasonable searches and seizures.  The district court denied the defendants

qualified immunity, and the Tenth Circuit affirmed.

The Tenth Circuit agreed with the district court's determination that the ex parte order,

procured by misrepresentations and omissions, violated Malik's liberty interest in familial

integrity. *Id.* at 1315.  The Tenth Circuit agreed with the district court's finding that the

defendants "did not believe that the child faced such danger to warrant seeking temporary

protective custody in an ex parte proceeding." *Id.*  In addition, the Tenth Circuit agreed with the

district court's finding that the government officials' procurement of a court order to seize a

child through "distortion, misrepresentation and omission" violated the child's Fourth

Amendment rights.  *Id.* at 1316.  "Officials cannot reasonably assume that the law permits them

to obtain a custody order . . . through reckless omission of probative facts to a magistrate." *Id.*

*See also*, *Rinehart v. Smart*, 2006 WL 1525939, * 4 (W.D. Okla. May 25, 2010) (holding that

plaintiffs' right to familial integrity was violated when defendants provided false information to

the district attorney who filed a petition seeking to take custody of plaintiffs' children).

### B.  New Mexico Law Regarding Child Abuse Investigations

A social worker in New Mexico is required to report any suspected child abuse to the

nearest law enforcement agency:

> A. Every . . . social worker acting in an official capacity . . . who knows or has a
> reasonable suspicion that a child is an abused or a neglected child shall report the matter
> immediately to:
>> (1) a local law enforcement agency;
>> (2) the department; or
>> (3) a tribal law enforcement or social services agency for any Indian child
>> residing in Indian country.

NMSA 1978 § 32A-4-3.  The New Mexico statutes "codify the principle that the State must act

to keep children safe, and in some instances, take temporary custody of them." *Arredondo v.*

*Locklear*, 371 F. Supp. 2d 1281, 1284 (D. N.M. 2005) (citing NMSA §§ 32A–4–1 et seq.)

Under the New Mexico statutes, an "abused child" includes a child "who has suffered physical

abuse . . . ." *Id.* (citing NMSA 1978 § 32A-4-2(B) (2)).  "'[P]hysical abuse' includes but is not

limited to any case in which the child exhibits evidence of skin bruising, . . . [or] soft tissue

swelling . . . and there is no justifiable explanation for the condition . . ."  NMSA 1978 § 32A-4-

1(F)(1).  As these statutes demonstrate, New Mexico has a compelling interest in the welfare of

children, and its agents may investigate evidence of abuse as long as constitutionally adequate

procedures are followed.  *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997).

Thus, under New Mexico law, Pattison was required to report her observation of a bruise

on L.A.'s thigh because bruising without a justifiable explanation can be  a sign of physical

abuse. *See* NMSA 1978 § 32A-4-1(F)(1).

### C.  Plaintiff's Right To Familial Integrity Was Not Violated

A parent's interest in familial integrity "has never been deemed absolute or unqualified."

*Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir. 1994).  For example, the right is not violated

when a child is not removed from the parent's home or custody for some significant time period.

*Id.* at 1491.  In *Martinez*, a social worker reported a mother as a neglectful parent because the

mother did not seek psychological counseling for her four-year old daughter after her daughter

had been raped. *Id.* at 1489.  The social worker sought an order requiring the mother to take her

daughter for psychological testing and treatment but did not seek physical custody of the child.

*Id.*  The court noted that although the social worker's actions may have been unreasonable, the

mother was never physically separated from her daughter; hence, no constitutional violation

occurred.  *Id.* at 1491.

Pattison contends that Plaintiff has not disputed the existence of a hand print on L.A.'s

16

thigh; thus, her report was not false.  As the Court has already determined, Pattison was obligated under New Mexico law to report suspected child abuse.  Pattison asserts that the report, the investigation, the hearing on the Ex Parte Motion, and the Oasis Interview, are not sufficient as a matter of law to constitute an interference with Plaintiff's familial integrity because L.A. was never removed from Plaintiff's custody.  The only physical separation of L.A. from Plaintiff occurred during the fifty-minute Oasis Interview, and Pattison contends that this brief separation is insufficient as a matter of law to constitute a violation of Plaintiff's right to familial integrity.

1.  The evidence shows that Pattison did not make a false report.

The Court finds that Plaintiff has not shown that Pattison violated his right to familial integrity by making a false report.  Plaintiff has not come forward with any evidence that Pattison misrepresented or omitted important facts in her report.  Therefore, Pattison did not violate Plaintiff's right to familial integrity by making a false report of child abuse

2.  There was no actionable interference with familial integrity.

Even though L.A. was separated from Plaintiff for the fifty-minute Oasis Interview, this brief separation is insufficient as a matter of law to constitute a violation of Plaintiff's right to familial integrity.  *Compare J.B. v. Washington County*, 905 F. Supp. 979, 988 (D. Utah 1995) (finding that sufficient separation occurred when child was removed overnight for a morning interview based on an anonymous complaint that child had been abused because child was away from parents for 18 hours) *with Martinez*, 35 F.3d at 1491 (no physical separation as a result of social worker's pursuit of legal custody to require the parent to seek psychological counseling for the child).

As noted by the court in *Martinez*, "[s]ocial workers face extreme difficulties in trying

17

simultaneously to help preserve families and to serve the child's best interests." *Id.* at 1490.  The

*Martinez* court recognized that even though the social worker sought legal custody of the child,

the child was "never removed physically from her mother."  *Id.* at 1491.  The court concluded

that "[b]y pursuing the state's interest in the child, [the social worker] did not violate the

Constitution by *temporarily* compromising the right to familial integrity." *Id.* (emphasis added).

Similarly, the court-ordered Oasis Interview of L.A., which lasted only fifty-minutes, is an

insufficient interference to constitute a violation of Plaintiff's right to familial integrity. *Id.*

Moreover, even if the separation for fifty minutes could be viewed as constitutionally

significant, "[n]ot every statement or act that *results* in an interference with the rights of intimate

association is actionable."  *J.B. v. Washington County*, 127 F.3d at 927.  In *J.B. v. Washington*

*County*, officials received an anonymous eye witness report that "a seven-year-old child, . . . had

been sexually abused by her father." *Id.* at 922.  Officials obtained a court order allowing them

to remove the child and place her in a shelter overnight for an interview the next day.  Although

this 18-hour separation was significantly long for an interference claim, the court ruled that the

officials did not *impermissibly* interfere with the parent's rights given the basis of the report,

sexual abuse, and the procedures employed. *Id.* 928 (holding that although officials could have

accomplished their objective within a shorter period of time, the officials' conduct did not

violate parents' substantive due process rights.)

In this case the evidence shows Pattison reported what she observed and was interviewed

by both the Clovis Police Department and the Clovis and Hobbs CYFD investigators.  The

investigation was appropriately conducted, and the evidence shows Pattison was not involved in

any decisions regarding the investigation.  Based on the evidence presented, the Court finds that

Plaintiff has failed to prove that Pattison violated his substantive due process right to familial

integrity.

3.   No evidence that Pattison violated CYFD procedure.

Plaintiff also alleges that Pattison failed to use proper procedures for the  investigation so as to prevent a conflict of interest "by assigning her subordinates to confront and to scrutinize [Plaintiff] and his family." (Compl. ¶ 29.)  The evidence of record, however, shows that Pattison did not violate CYFD procedures, did not order her subordinates at the CYFD to search Plaintiff's home, and did not deprive Plaintiff of custody of his child during her brief involvement in the investigation, which consisted of making the report and being interviewed by a police officer and two CYFD investigators.

Because New Mexico has a compelling interest in the welfare of children, the relationship between parent and child may be investigated and even terminated as long as constitutionally adequate procedures are followed. *Hollingsworth*, 110 F.3d at 738; *Watterson*, 987 F.2d at 9.  In this case, there is no evidence that Pattison circumvented or controlled the procedures that were employed in the investigation of Pattison's report.  Graves, the CYFD investigator who performed the initial welfare check, testified that Pattison did not direct him to conduct the welfare check and did not direct him to search Plaintiff's residence. (Graves Aff. ¶ 4.)  Graves was asked by his supervisor, Carol Gonzales, to conduct the welfare check at both L.A.'s "mother's and father's house to ensure that the minor child was not in danger." (Graves Aff. ¶ 8.)  After the initial welfare checks, Graves had no other involvement in the investigation, and Graves never talked to Pattison about the CYFD investigation "other than when I interviewed her in connection with the welfare check. . . ."  (Graves Aff. ¶ 21.)

Garcia, a supervisor in the Hobbs CYFD office, assigned the investigation to Alvarez precisely because Garcia knew that Alvarez did not know Pattison. (Garcia Aff. ¶ 10.)  Garcia

19

instructed Alvarez to interview all persons involved, including L.A., Pattison, Plaintiff,
Plaintiff's parents and Defendant Arguello.  Pattison did not violate CYFD procedures because
Pattison did not supervise or participate in the investigation as a CYFD official.

                        4.  Pattison conduct has no direct causal connection with the Oasis
                        Interview.

      To state a constitutional violation against a public official, a plaintiff must demonstrate
sufficient personal involvement in the alleged violation to show a causal connection between the
actions of the defendant and the constitutional violation. *Buck v. City of Albuquerque*, 549 F.3d
1269, 1279-80 (10th Cir. 2008); *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996) (stating that
a plaintiff may show a constitutional violation when supervisor personally directs the violation
or had actual knowledge of the violation and acquiesced in its continuance).  Plaintiff alleges
"Pattison directed her subordinates to search his home" and to "deprive him of his child during
the investigatory process." (Compl. ¶ 27.)  However, the evidence shows that Pattison was not
directly involved in the CYFD investigation.  Even though Pattison's report started the
investigation, which eventually led to the Oasis Interview, Pattison's actions did not have a
direct causal connection to the manner in which the investigation was conducted, including the
request for the Oasis Interview.  Significantly, the Oasis Interview was ordered by the domestic
relations court that was considering Plaintiff's Ex Parte Motion asking for an order to stop the
child abuse investigation.  The Ex Parte Motion led Detective Smith to seek out legal advice
from the Assistant District Attorney Stover because Detective Smith was afraid that if the court
granted the Ex Parte Motion, the investigation would be compromised.  Assistant District
Attorney Barnett, who represented the State at the hearing on the Ex Parte Motion, asked that the
Ex Parte Motion be denied so as not to impede the investigation.  At the hearing, CYFD

Attorney Patricia Schroeder asked for an order requiring the Oasis Interview as part of the investigation.  There is no evidence in the record that Pattison was involved with Attorney Schroeder's decision to ask the court for an Oasis Interview.[10]  Even if the time L.A. spent in the Oasis Interview could be viewed as a constitutionally significant separation from Plaintiff, there is no evidence showing Pattison was the driving force behind it.  Hence, Pattison is entitled to qualified immunity from Plaintiff's § 1983 claims for violation of his Fourteenth Amendment right to familial integrity.

### D. Pattison Did Not Violate Plaintiff's Fourth Amendment Rights

Plaintiff asserts that Pattison violated his right "not to have [his] liberty placed in issue by the state without probable cause[.]" (Compl. ¶ 26.)  Plaintiff alleges that Pattison "caus[ed] her subordinate employees to search his home, deprive him of his child during the investigatory process, and requir[ed] him to relinquish his child during the investigatory process or else face criminal sanctions." (Compl. ¶ 27.)  According to Plaintiff, "Defendant Pattison engaged in such conduct with no legitimate purpose, without any probable cause that LA was in danger, without any reasonable suspicion of such danger or risk, and with the intent to place greater burdens on Mr. Arguello and to improperly sway the results of the divorce and custody proceedings then pending . . . ." (Compl. ¶ 28.)  However, these allegations are not supported by evidence.

Notably, a parent may not assert a violation of his own Fourth Amendment right to be

---

[10] Plaintiff attempts to create a causal connection by emphasizing Attorney Schroeder's statement in court that the CYFD seeks an Oasis Interview "as part of our investigation." (*See* Resp. Ex. C Partial Transcript of February 15, 2010 hearing).  In the same portion of the transcript presented by Plaintiff, Attorney Schroeder states that she attended the hearing "at the request of Mr. Holden" the Assistant District Attorney whose advice was sought by Detective Smith. (*Id.*) Schroeder's statement is not evidence of a causal connection between Pattison and the Oasis Interview.

free from unreasonable seizures based on a seizure of his child. *Hollingsworth v. Hill*, 110 F.3d 733, 738 (10th Cir. 1997). "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). Thus, Plaintiff may not assert that his Fourth Amendment rights were violated even if the investigators "deprive[d] him of his child during the investigatory process." (Compl. ¶ 27.)

However, Plaintiff correctly asserts that a social worker is held to the same Fourth Amendment standards as a police officer when conducting investigations of child abuse. *Malik*, 191 F.3d at 1316 (stating law was clearly established that officials' procurement through distortion, misrepresentation or omission of a court order to seize a child is a violation of the Fourth Amendment). But, Plaintiff presents no evidence to back up the assertions that he was unlawfully treated during the investigation. There is no evidence that Pattison directed Graves or Officer Thron to enter and search the Plaintiff's home. Beyond Pattison's initial report and interviews, there is no evidence that Pattison was directly involved in the investigation. Pattison was intentionally separated from the investigation from the beginning. Graves was directed to perform a welfare check by his supervisor Gonzales and not by Pattison. And soon after the welfare check, the case was transferred to the Hobbs office of the CYFD. Nothing in the record supports Plaintiff's allegation that Pattison "used her position as a supervisor to the investigators" causing the investigators to violate Plaintiff's Fourth Amendment rights by entering his house and interrogating Plaintiff. (Plaintiff's Answers to Pattison's First Interrogatories, Mot. Ex. 6 at 2.)

Plaintiff further asserts that he was unlawfully seized because he was restricted in his activities, actions, and abilities during the three months "through his fear of his child being removed from his custody and as a result of the threat of prosecution if he did not comply

completely with the investigation of CYFD and the police." (*Id.* 12-13.)  However, these

restrictions do not constitute a seizure of Plaintiff.  As illustrated by *Becker v. Kroll*, 494 F.3d

904, 915-16 (10th Cir. 2007), the Tenth Circuit does not consider persons who are under

criminal investigation to have been seized unless they are arrested.  Perceived or actual

limitations on activity are insufficient to constitute a seizure under *Becker*.

In *Becker*, the plaintiff Becker was a physician who was the subject of a Medicaid fraud

investigation.  After administrative proceedings and the filing and withdrawal of a civil suit by

the Utah Medicaid Fraud Control Unit (MFCU), Becker was charged with improper billing of

the Medicaid program, which is a felony offense.  Becker was never arrested or held in custody

during the criminal investigation, which lasted nine months.  After the charges were dismissed,

Becker asserted § 1983 claims for violations of her Fourth Amendment rights.  The Tenth

Circuit upheld the district court's conclusion that Becker had not stated a claim for relief under

the Fourth Amendment because Becker never was arrested. *Id*. at 916. "Violation of the Fourth

Amendment requires an intentional acquisition of physical control." *Id.* at 914 (quoting *Brower*

*v. County of Inyo*, 489 U.S. 593, 596 (1989)). The court noted,

> While the consequences of unfounded criminal charges are surely grave, the Fourth
> Amendment adequately covers constitutional interests in the pre-trial exercise of
> government control over a person or property. A groundless charging decision may abuse
> the criminal process, but it does not, in and of itself, violate the Fourth Amendment
> absent a significant restriction on liberty.

*Id.* at 915.  In this case, no evidence was presented showing that Plaintiff was subject to a

"significant restriction on [his] liberty." *Id.* (noting that Becker was not required to post bond,

was not required to appear in court, and had no specific restrictions on her freedom of

movement, which are limitations recognized by other circuit courts that may support a Fourth

Amendment violation).   Hence, Plaintiff was never seized within the meaning of the Fourth

Amendment; therefore, he cannot pursue a Fourth Amendment claim against Pattison.

Plaintiff next disputes Pattison's argument that "[n]o search of the Plaintiff's home was ever conducted by CYFD personnel at all and no search was conducted at the direction of Ms. Pattison."  Mot. at p. 17.  Plaintiff may have properly asserted that his residence was searched during the initial welfare check, but again, Pattison was not directly involved in the search. Plaintiff also seems to dispute the allegations by Pattison that he consented to Graves' and Officer Thron's entry into his residence.  Plaintiff testified in his affidavit that he did not voluntarily consent to their entry because he felt compelled to acquiesce due to the presence of an armed officer. (J. Arguello Aff. ¶ 33.)  However, Pattison cannot be held liable for any actions of Graves or Officer Thron because Pattison was not directly involved with the investigation beyond her initial report and interviews.  Thus, the Fourth Amendment claims against Pattison based on an allegedly improper search of Plaintiff's residence cannot stand, and the Court will dismiss the Fourth Amendment claims brought under 42 U.S.C. § 1983.

### 4.  Supplemental Jurisdiction

Since the Court will dismiss Plaintiff's claims brought under 42 U.S.C. § 1983, the Court may decline to exercise its supplemental jurisdiction over the claims asserted under state law for defamation and *prima facie* tort.  *See* 28 U.S.C. § 1367(c)(3) (stating that federal district courts may decline to exercise supplemental jurisdiction in cases involving federal question jurisdiction when all federal claims have been dismissed).  Accordingly, the Court will decline to exercise supplemental jurisdiction over the state law claims, and will, in its discretion, remand this case to the Ninth Judicial District Court, Curry County, New Mexico.  *See Woodberry v. Bruce*, 109 Fed. App'x 370, 373 (10th Cir. 2004) (citing *Gold v. Local 7 United Food and Commercial Workers Union*, 159 F.3d 1307, 1310 (10th Cir. 1998)).

24

IT IS ORDERED that the MOTION FOR SUMMARY JUDGMENT ON QUALIFIED

IMMUNITY OF DEFENDANT PATTISON (Doc. No. 36) is granted as follows:

    1.  Plaintiff's First Claim for Relief against Defendant Keri Pattison will be dismissed.

    2.  The case will be remanded to the Ninth Judicial District Court, Curry County, New

Mexico.

_____
SENIOR UNITED STATES DISTRICT JUDGE

25